FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

01 JUN 22 AM 9: 14

PAMELA R. LEWIS,      )
                                       )
        Plaintiff,      )

                                         )
v.                               ) CIVIL ACTION NO. 00-JEO-0783-S
                                         )
ERVIN CABLE CONSTRUCTION,      )
MARK NEWTON, EDDIE CHURCH,      )
and ROBERT WORTHEY,      )
                                         )
        Defendants.      )

DISTRICT COURT
N.D. OF ALABAMA

**ENTERED**

JUN 2 2 2001

## MEMORANDUM OPINION

Plaintiff Pamela R. Lewis ("the plaintiff") filed this action, asserting various claims against Ervin Cable Construction, Incorporated ("Ervin"), Mark Newton ("Newton"), Eddie Church ("Church") and Robert Worthey ("Worthey") (collectively "the defendants"). Specifically, she asserts claims that include sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, as amended; outrage; assault and battery; and negligent hiring, training, and supervision. (Doc. 1). She filed an amended complaint generally reiterating her previous claims. (Doc. 15). The defendants have filed a motion for complete summary judgment. (Doc. 17). Upon consideration, the court finds that the motion is due to be granted in part and denied in part. Additionally, the assault and battery claim against Newton is due to be dismissed without prejudice to the plaintiff's right to refile the claim in state court. This court further finds that the defendants' motion to the extent that it seeks summary judgment on the issue of punitive damages on the assault and battery claim is moot at this point and subject to being renewed should the plaintiff file this action in state court.

32

## I. FACTS

The plaintiff was hired on October 17, 1999, by Eddie Church, an Ervin supervisor, who was responsible for hiring and firing, to work in the company's Sumiton warehouse. (Church Deposition[1] ("Church") at 6-7;  Lewis Deposition ("Lewis") at Exhibit 1). As part of the employment process, the plaintiff completed the necessary paperwork for the human resources department, provided Ervin with a copy of her driver's license, and signed for and received a copy of Ervin's harassment policy. (Church at 11-13; Lewis at 344; Exhibits 1 & 3).

The plaintiff was assigned to the warehouse as a full-time employee. (Church at 34). She occasionally was assigned to work at other job sites even though she remained a warehouse employee.  (*Id*. at 14-15). As part of her responsibilities, the plaintiff was required to drive a company vehicle to pick up parts and supplies as needed. (Church at 14-15, 35-36). Having a valid driver's license was a requirement of the plaintiff's position. (Church at 35-36; Lewis at 294-95, 343).[2] Church determined the plaintiff's work assignments and occasionally assigned her to work at a job site with Mark Newton, a crew foreman. (*Id*.). Robert Worthey ("Worthey") was Church's immediate supervisor. (*Id*. at 16).

About October 20-25, 1999, the plaintiff was assigned to work on Newton's work crew outside the warehouse. (Lewis at 184-85). At the site, Newton asked the plaintiff if she "wanted to go up in a bucket so [she] could learn something on the power pole wire." (*Id*. at 185-86, *see also* 210-11). Wanting to learn, she "jumped in the bucket.  It was a tight fit, and [she] was

---

[1] Church's deposition is found at document 17, exhibit 2; Lewis's deposition is found at document 17, exhibit 1.

[2] Ervin's Safety Manual requires that "[a]ny employee driving a Company vehicle must have a valid driver's license in his or her possession." (Lewis at 339-40, Exhibit 9, p. B-5, ¶ 1).  A failure to report a suspension will result in disciplinary action. (Lewis at 342-43; Exhibit 9, p. B-5, ¶ 11).

looking up at the pole." (*Id.* at 186). She states that Newton then grabbed her by her waist and pulled her towards him. (*Id.* at 186, 212-13). She "could feel his groin [about her backside] through the[ir] jeans." (*Id.* at 186-87). She told him that was not acceptable conduct and he returned the bucket to the ground. (*Id.* at 211, 215). Nothing further happened while she was out on Newton's crew that day. (*Id.* at 219). According to the plaintiff, she "never mentioned it [the incident] to anybody. [She] just let it be. [She] tried to approach [Church]," but was told that she talked too much. (*Id.* at 215). She also explained her failure to report the incident because Church was Newton's neighbor and she was a new employee. (*Id.* at 218).

About this time, the plaintiff was involved in another "incident" with a female secretary, Becky Vanderweel, in the corporate office. Apparently, the secretary was off from work and the plaintiff was in the office when someone else needed some maps. While helping out by locating the maps, the plaintiff organized the office. (Lewis at 221-22). Because, according to the plaintiff, the secretary was "insecure about her job," the secretary "began trying to make [her] look bad by slandering [and] defaming her." (*Id.* at 221). She also told the plaintiff that she did not want her help. (*Id.*).[3]

A short time later, Church came to a site where she was working. The plaintiff approached him and tried to discuss her problems with Vanderweel and Newton. (Lewis at 244). She told Church that Vanderweel did not want her doing anything that pertained to her job and she made her feel uncomfortable in the Sumiton warehouse. Church responded that "[h]e didn't want to hear it." (*Id.*). The plaintiff also stated that she and Newton were having some issues.

---

[3] Although the plaintiff initially listed this as an example of harassment, at her deposition, she stated that the conduct was not based on her sex. (Lewis at 238).

3

She did not specify to Church what those issues were because he stated, "You talk too much." (*Id*. at 244, 420, 483). She responded by walking away and returning to her job. (*Id*.). She did not mention anything about sex harassment because she felt like she did not have the opportunity. (*Id*. at 245-46). She did not report the incident to anyone above Newton, to the human resources department, or via the company's toll free telephone number. (*Id*. at 246).

The plaintiff stated that she did not report the incident to Worthey, who was Church's supervisor, because the first time she met him he called her an "asshole." (Lewis at 248). Therefore, she felt that approaching him would have been "self-defeating and redundant." (*Id*. at 249). Specifically, she stated that the first time she met Worthey he asked her to lay some cable out in a figure eight. (*Id*. at 250). As she was walking away, she explained that Worthey stated the word "asshole." (*Id*. at 251). She turned around and "asked him if that would be a hairy asshole or just a plain 'ol damn asshole.'" (*Id*.). He did not say anything. She walked away and began laying the cable in a figure eight. The plaintiff presumed that Worthey was making the comment about her because no one else was around and the "expression on his face said it all. [She] knew it was about [her] or [she] never would have said anything." (*Id*. at 252). Worthey treated her professionally and courteously after that over the next couple of days in their limited encounters. (*Id*. at 260-64).

In another incident, in early November, the plaintiff wrote a short note to a secretary in the office on a piece of paper with another note written to someone in the office by Newton. (Lewis at 402). Her note stated, "[H]i Krista[.]" "[S]ee ya, Amy." (*Id*. at 265–67).[4] Somehow

---

[4] A list of the plaintiff's complaints enumerates the content of the note as "C-Ya Amy, Hi Christa, Pam." (*Id*. at 265–67; Exhibit 6). The differences are insignificant under the circumstances.

this note became a "love note" from her to the secretaries at least in part because Newton purportedly told other people she was pursuing them. (*Id*. at 265-66, 270).

In the last incident, Newton and the plaintiff drove to a site with some mortar mix. When they arrived, and before they began unloading the mortar, Newton stated that he needed to go to the bathroom. (Lewis at 286-88). The plaintiff stated that she would wait in the truck. He replied that he "was hoping [she w]ould hold [his] dick . . . ." (*Id*. at 286-290). She stated that she did not think so and she told him that was inappropriate.

About November 15, 1999, the plaintiff told Church that her driver's license had been suspended. (Lewis at 181-83, 294, 454). A November 17, 1999, license check confirmed for Ervin that the plaintiff's license had been suspended. (*Id*. at Exhibit 5). Church decided to lay the plaintiff off of work. (Church at 31). He informed the plaintiff on the same day that she was being laid off because she no longer had a valid driver's license. (Church at 31; Lewis at 301). Church informed her that if she was able to get her license reissued, she could return to work. (Church at 33; Lewis at 455).

On December 17, 1999, the plaintiff filed a charge of sex discrimination against Ervin. She alleged she was subjected to sexual harassment. She stated:

> I was hired by the above-named employer on October 1, 1999, as a laborer. On November 18, 1999, I was discharged from my position as a laborer. I was subjected to sexual harassment in the form of unwelcome sexual advances of both a physical and verbal nature by my Crew Leader. There were several incidents of sexual harassment. I complained to top management, but they took no action to stop the harassment. As a result of my complaints, I was threatened with discharge. I was falsely accused by my male co-workers of having sexual intentions toward the female employees in the office. I was addressed in a loud and unprofessional manner. Similarly situated male co-workers were not subjected to harassment in this manner.

> The employer stated that I was being discharged because I did not have a valid driver's license. The employer had four employees assigned to each truck. A valid driver's license was not a requirement to do the job. The employer has male employees who do not have a valid driver's license, but they are still employed.
>
> I believe that I was discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964 as amended. I was the only female employee on Mark Newton's crew.

(Lewis, Exhibit 7, EEOC Charge). A "Notice of Right to Sue" was issued at the plaintiff's request on December 28, 1999. (*Id.*, "Notice of Right to Sue"). She filed the present complaint on March 28, 2000.

The plaintiff did not attempt to return to work. (Lewis at 383, 488). She was terminated on July 14, 2000. (Doc. 20, Exhibit 2, Response to Interrogatory # 3). Her license was still suspended at the time of her deposition. (*Id.* at 328, 382-83).

## II. PROCEDURAL HISTORY

The plaintiff's amended complaint generally appears to allege sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, as amended; outrage; assault and battery; and negligent hiring, training, and supervision against the various defendants. The defendants filed their motion for complete summary judgment on January 16, 2001. The plaintiff's response was due by February 2, 2001. Pursuant to an agreement of the parties, the plaintiff's brief was filed on February 27, 2001. (Doc. 20). The plaintiff's response addresses the Title VII retaliation claim against Ervin and the claims for assault and battery and outrage against Newton. The remaining claims, upon agreement of counsel, will be dismissed with prejudice. (Doc. 21, ¶ 2; Doc. 25, p. 1). This was confirmed by counsel for the plaintiff at the hearing on the motion. Additionally, the plaintiff is not advancing a Title VII discrimination or

6

harassment claim in this action.  Accordingly, the only claims for consideration at this juncture are the ones dealing with retaliation, assault and battery, and outrage. They will be addressed separately.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991);  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof.  *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party

need not present evidence in a form necessary for admission at trial; however, the movant may

not merely rest on the pleadings. (*Id.*).

After a motion has been responded to, the court must grant summary judgment if there is

no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are

irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d

202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at

249.

### B. The Retaliation Claim

The defendants assert that the plaintiff's retaliation claim is outside the scope of her

EEOC charge. (Doc. 18, p. 23). The plaintiff counters that the claim is included in the charge

and, even if it was not, summary judgment is not due to be granted because the retaliation

occurred after the filing of the EEOC charge. (Doc. 20, pp. 2-3). In addressing this issue it is

appropriate to first articulate the plaintiff's retaliation claim. The complaint alleges her

retaliation claim in paragraph 17. It provides:

> Because of Plaintiff's refusal to consent or acquiesce to the sexual conduct
> of Defendants, Defendant Ervin retaliated against Plaintiff by firing the Plaintiff
> under the pretext that Plaintiff was unable to legally drive Defendant's truck.

(Doc. 1, ¶ 17).

### 1. Generally

As recently stated by the United States Supreme Court:

> Under Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended,
> 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against
> any of his employees . . . because [the employee] has opposed any practice made
> an unlawful employment practice by [Title VII], or because [the employee] has
> made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under [Title VII]."

*Clark County School Dist. v. Breeden*, ___ U.S. ___, 121 S. Ct. 1508, 1509 (2001). Reading the

plaintiff's complaint and arguments liberally, she appears to assert that her November layoff and

her July termination were in retaliation for protected activities.

In assessing the merits of her claims and the present motion, the first issue is whether she

sufficiently presented her retaliation claim in her EEOC charge. If she has, then the court must

address the substantive merits of the same.

### 2. EEOC Charge

It is well-settled that a Title VII plaintiff's complaint "is limited by the scope of the

EEOC investigation which can reasonably be expected to grow out of the charge of

discrimination." *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994), *cert.*

*denied*, 513 U.S. 919 (1994), *citing Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.

1970); *Turner v. Orr*, 804 F.2d 1223, 1224 (11th Cir. 1986). It is also "well established that 'the

scope of an EEOC complaint should not be strictly interpreted.'" *Sanchez*, 431 F.2d at 465. The

claim presented in court must be "like or related" to the EEOC charge. *Turner*, 804 F.2d at 1226.

The Eleventh Circuit Court of Appeals has stated:

> As long as allegations in the judicial complaint and proof are "reasonably related"
> to charges in the administrative filing and "no material differences" between them
> exist, the court will entertain them. As we have noted . . ., "the 'scope' of the
> judicial complaint is limited to the 'scope' of the EEOC investigation which can
> reasonably be expected to grow out of the charge of discrimination."

> Judicial claims which serve to amplify, clarify, or more clearly focus earlier EEO complaints are appropriate.  Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate.

*Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989), *citing Ray v. Freeman,* 626 F.2d 439, 443

(5th Cir. 1980), *cert. denied,* 450 U.S. 997 (1981), *quoting Sanchez.*

On the "Charge of Discrimination" form, the plaintiff checked the box indicating that the

cause of the discrimination was sex. (Lewis, Exhibit 1 (EEOC Charge), p. 1).  She cursorily

mentioned that she "complained to top management, but they took no action to stop the

harassment" and that, as a result of the complaints, she "was threatened with discharge." (*Id.*).

Although terse, the court finds this reference sufficient presentation of the charge under the

particular facts in this case.  It is reasonable to expect that, under the circumstances, the EEOC

investigation would include an inquiry into such purported retaliatory conduct.

Ervin's reliance on *Durham v. Phillippou*, 968 F. Supp. 648, 658 (M.D. Ala. 1997),

*Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544-45 n.2 (7th Cir. 1988), *cert. denied*, 491 U.S.

907 (1989), and *Riley v. Tech. & Management Servs.*, 872 F. Supp. 1454 (S.D. Md. 1995), *aff'd*,

79 F.3d 1141 (4th Cir. 1996), is insufficient to sway this court's opinion.  Those cases are

factually distinguishable.  For instance, in *Durham* and *Riley*, the plaintiffs never mentioned

retaliation in their EEOC charges.  *Durham*, 968 F. Supp. at 658; *Riley*, 872 F. Supp. at 1359-60.

Similarly, in *Steffen*, the plaintiff neither mentioned retaliation nor any other words to that effect.

*Steffen*, 859 F.2d at 544.

### 3. The Substantive Merits

The appropriate framework from which to evaluate the plaintiff's retaliation claim is  the

familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36

L. Ed. 2d 668 (1973), standard when circumstantial evidence is involved.[5] *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1310-11 (11ᵗʰ Cir.), *superseded in part on other grounds*, 151 F.3d 1321 (11ᵗʰ Cir. 1998). The plaintiff has the initial "burden of establishing a prima facie case." *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. "If a plaintiff establishes a prima facie case of [retaliation], the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chambers v. Walt Disney World, Co.*, 132 F. Supp. 2d 1356, 2001 WL 227390 (M.D. Fla.) quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11ᵗʰ Cir. 2000) (en banc). Once the defendant has articulated its legitimate, nondiscriminatory reasons for the plaintiff's termination, the court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11ᵗʰ Cir.), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997) (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11ᵗʰ Cir. 1994)). This must include an evaluation of "whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538. If it is "determine[d] that a reasonable jury could conclude that the employer's articulated reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference

---

[5] The plaintiff does not assert that there is direct evidence of discrimination.

11

of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *(Id.)*.

### a. Prima Facie Case

To establish a prima facie case of retaliation, the plaintiff must prove three elements: (1) that she engaged in statutorily protected activity; (2) that she suffered adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11th Cir.), *cert. denied*, 525 U.S. 1000 (1998). Because it is undisputed that plaintiff suffered an adverse employment action, the court will only discuss the two remaining prongs of the prima facie case. (Doc. 18, p. 26).

### i. Protected activity

The defendant asserts that the plaintiff did engage in protected activity, that is, the filing of the EEOC charge, but it occurred after the adverse employment action, the layoff. (Doc. 18, pp. 26-27). The plaintiff counters that there is a factual dispute concerning the timing of the retaliatory act. (Doc. 20, pp. 2-4). She claims that the retaliatory act was her termination on July 14, 2000, after the filing of the EEOC charge. Additionally, she claims that her attempt to talk to Church also constitutes protected activity. *(Id.)*.

There are two employment decisions at issue in this case. The first is the November layoff and the second is the July termination. Each will be addressed separately.

The court agrees with the defendant that the November layoff cannot support the plaintiff's retaliation claim. The filing of the EEOC charge in December was clearly protected activity. However, it was after the layoff. The only "alleged" protected activity before the EEOC charge was the plaintiff's "attempts" to report Newton's conduct to Church and Worthey.

12

The court, however, finds these actions insufficient.

> The Eleventh Circuit Court of Appeals has stated:
>
> > A plaintiff engages in 'statutorily protected activity' when he or she protests an
> > employer's conduct which is actually lawful, so long as he or she demonstrates "a
> > good faith, reasonable belief that the employer was engaged in unlawful
> > employment practices." *Little v. United Technologies, Carrier Transicold
> > Division*, 103 F.3d 956, 960 (11th Cir. 1997). However, it is insufficient for a
> > plaintiff "to allege his belief in this regard was honest and bona fide; the
> > allegations and record must also indicate that the belief, though perhaps mistaken,
> > was objectively reasonable." *Id.*

*Harper*, 139 F.3d at 1388. "Statutorily protected expression includes filing complaints with the

EEOC and complaining to superiors about sexual harassment. *See, e.g., Rollins v. State of Fla.*

*Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) ('[T]he protection afforded by the

statute is not limited to individuals who have filed formal complaints, but extends as well to

those, like [appellant], who informally voice complaints to their superiors or who use their

employers' internal grievance procedures.')." *Johnson v. Booker T. Washington Broadcasting*

*Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000). The question herein is simply whether the

plaintiff engaged in protected activity prior to the layoff.

Looking at the evidence in a light most favorable to the plaintiff, the court finds that she

was having difficulties at work with both men and women.  These problems included Newton's

conduct, the difficulty with Vanderweel, and the "asshole" incident with Worthey.  When she

went to talk with Church, he complained she talked too much.  According to the plaintiff,

Church's comment prevented her from presenting her complaints.  It is undisputed that the

plaintiff did not mention sexual harassment or the substance of Newton's actions to Church.

(Lewis at 244-45).  This is insufficient to bring her actions within the framework of "statutorily

protected activity." *Harper*, 139 F.3d at 1388. More is required. Although the court is not impressed by Church's comment, that is not the issue. The plaintiff was and is required to do more to warrant submission of her claim to the jury. She is required to put the defendant on notice of the complaints. She could have reported the incidents to someone in the human resources department or she could have made her complaint via the toll-free telephone number that was available. Based upon the facts before it, the court cannot find that evidence of the plaintiff's "attempt" to talk with Church overcomes the motion for summary judgment.

Similarly, her decision not to approach Worthey with her complaints after her first encounter with him is not sufficient to excuse the necessary element that she engage in a protected activity. To find otherwise would encourage plaintiffs to use personality differences as mere excuses for failing to act as required by the law.[6]

The July termination is a sufficient adverse employment action to support the plaintiff's prima facie case because it occurred after the filing of the EEOC charge. Thus, this fact would satisfy the first two elements of a prima facie case requiring a protected activity and an adverse employment action.

### ii. Causal connection

The last consideration under the prima facie case is whether the plaintiff has established a causal connection between the protected activity (the filing of the EEOC charge) and the adverse employment action (the July termination). The defendant argues that she has not established the

---

[6] Additionally, under the facts, there is no evidence that Church or Worthey knew at the time of the layoff that the plaintiff engaged in any protected activity. *See Breeden*, 121 S. Ct. at 1511 (there was no indication that the actor knew about the right-to-sue letter at the time of the employment action). *See also Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (listing the employer's awareness as a separate element of the prima facie case).

requisite connection. (Doc. 18, p. 27). In support of its argument, the defendant cites a litany of

cases in its reply brief discussing when the proximity of the protected activity and the adverse

employment action is sufficient to establish the requisite connection. The brief provides:

> See *Kelly v. Caldera*, 2000 WL 284263, at *4 (S.D. Ala. Feb. 28, 2000) (rejecting
> the plaintiff's argument that causation could be inferred from the close temporal
> proximity of the protected conduct and the adverse employment action when the
> adverse employment action occurred six (6) months after the protected activity);
> *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1320 (M.D.
> Ala.) (five (5) month gap between protected activity and adverse employment
> action "weakens any inference of retaliation"); *Connor v. Schnuck Markets*, 121
> F.3d 1390, 1395 (10th Cir. 1997) (finding that four (4) month lag between
> protected activity and termination not sufficient to justify inference of causation);
> *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (holding that a
> three (3) month delay between protected activity and adverse employment action
> insufficient to infer causation); *Valdez v. Mercy Hospital*, 961 F.2d 1401, 1403
> (8th Cir. 1992) (no retaliation found where six (6) months passed between
> protected activity and termination); *Filipovic v. K & R Express Systems, Inc.*, 176
> F.3d 390, 399 (7th Cir. 1999) (no prima facie case of retaliation where four (4)
> month delay between EEOC charge and plaintiff's termination was "counter-
> evidence of any causal connection"); *Hughes v. Derwinski*, 967 F.2d 1168, 1174
> (7th Cir. 1992) (finding four (4) month delay insufficient to establish causal
> connection); *Balleti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1549 (S.D. Fla. 1995)
> (elapse of six (6) months between grievance and discharge did not permit
> inference of causal connection); *Juarez v. Ameritech Mobile Communications,
> Inc.*, 746 F. Supp. 798, 804 (N.D. Ill. 1990) (six (6) months between complaint
> and termination too remote), aff'd 957 F.2d 317 (7th Cir. 1992); *Maldonado v.
> Metra*, 743 F. Supp. 563, 568 (N.D. Ill. 1990) (five (5) month lapse between
> protected expression and termination too remote); *Reeves v. Digital Equipment
> Corp.*, 710 F. Supp. 675, 677 (N.D. Ohio 1989) (no retaliation where three (3)
> months passed between protected expression and adverse employment action);
> *Brown v. ASD Computing Center*, 519 F. Supp. 1096, 1116-17 (S.D. Ohio 1981)
> (discharge four (4) months after protected activity too remote).

(Doc. 25, pp. 8-9). United States District Judge Robert B. Propst also recently addressed the

issue of what constitutes a causal relationship in the retaliation context in *Taylor v. Renfro Corp.*,

84 F. Supp. 2d 1248 (N.D. Ala. 2000). He stated:

> The Eleventh Circuit "interpret[s] 'the causal link requirement broadly; a

15

plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Meeks v. Computer Assoc. International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *Reichhold*, 988 F.2d at 1564). The Eleventh Circuit also does "not construe the 'causal link' . . . to be the sort of logical connection that would justify a prescription that the protected [activity] in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). And while not a per se requirement, courts do consider the amount of time lapsed between the time of the complaint and the time of the adverse employment action. *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1556 (11th Cir. 1995); *Maniccia v. Brown*, 171 F.3d 1364, 1369-70 (11th Cir. 1999).

A causal link has been found sufficient to withstand a defendant's motion for summary judgement, for example, where an employer discovered an employee's EEOC charge and a series of adverse employment actions commenced almost immediately, *Wideman*, 141 F.3d at 1457; where a supervisor was displeased with a HEW investigation and associated the employee who suffered adverse employment action with the investigation, *Simmons*, 757 F.2d at 1189; and where a plaintiff complained of sexual harassment in June, 1995, was terminated in April, 1997, and the plaintiff's performance evaluations for her 18 years of employment had been favorable, *Mortenson*, 54 F. Supp. 2d at 1124-25.

A causal link has not been found, for example, where the plaintiff failed a test and passing the test was necessary for being offered the job at issue, *Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997); where the adverse employment action occurred 15 and 21 months, respectively, after the plaintiff filed a grievance against her employer, *Maniccia*, 171 F.3d at 1370 ("The only causal connection established by the evidence is between Appellant's misconduct and her termination."); where the plaintiff failed to complete necessary management tasks, had a poor working relationship, and refused to accept constructive criticism, *Coutu*, 47 F.3d at 1074-75; where the time lapse between plaintiff's complaint and her termination was 16 months, *Aldridge*, 847 F. Supp. at 486; and where plaintiff's complaint was thoroughly investigated, a detailed report was filed concerning the investigation, the subject of the complaint was sanctioned, strenuous efforts were made to put plaintiff into another position within the company, and plaintiff was ultimately terminated six months after her complaint was filed, *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir. 1997).

In this case, plaintiff was terminated approximately four months after her last formal complaint regarding Richardson's conduct. The ensuing investigation

16

consisted of Todd asking Richardson and Ingle what had happened (but did not
include asking plaintiff what had happened), and cautioning Richardson and Ingle
to not say things which might be misinterpreted by other employees. She was
terminated for recounting socks in violation of company policy. She admitted to
recounting socks, but claimed it was inadvertent. Viewing the situation in the light
most favorable to the plaintiff, she made three "formal" complaints, and she
allegedly made numerous "informal" complaints up to January of 1997, one
month prior to her termination. Her work record prior to February 21, 1997, had
been unblemished. Richardson characterized her as a very good worker. [ ]
Richardson was also aware that Taylor had complained to Bennett about his
conduct. [ ] She was terminated on her first mistake, despite the fact that she
admitted the error and gave an explanation for it. Based on this, it does not appear
that the employment action and plaintiff's complaints were wholly unrelated.
Thus, plaintiff has satisfied the third prong.

*Taylor*, 84 F. Supp. 2d at 1259-60 (footnotes omitted). The United States Supreme Court in

*Breeden* found that a three month period between the issuance of a right-to-sue letter and an

announcement by the plaintiff's supervisor that she was contemplating transferring the employee

was insufficient to establish the causation element of her retaliation claim.[7] *Breeden*, 121 S. Ct.

at 1511. In so finding, the Court noted, "The cases that accept mere temporal proximity between

an employer's knowledge of protected activity and an adverse employment action as sufficient

evidence of causality to establish a prima facie case uniformly hold that the temporal proximity

must be 'very close.'" *Id.* (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.

2001)).

After reviewing these cases and the discussion therein, the court finds that the specific

inquiry necessary to determine whether the requisite relationship has been established must be

determined on a case-by-case basis. No one aspect of the consideration is necessarily

---

[7] It is appropriate to note that the EEOC charge was filed in *Breeden* almost two years earlier. *Breeden*, 121 S. Ct. at
1511. Additionally, the significance, if any, of the right-to-sue letter was not raised until the matter was appealed to the Ninth
Circuit. *Id.*

determinative. Under the present facts, the court finds that the causal relationship between the EEOC charge and the July termination is not sufficiently established to defeat the defendant's motion. First, there is an seven month lapse between the events. That is particularly significant because the plaintiff was laid off approximately eight months before the termination. Second, unlike the plaintiff in *Taylor*, Lewis did not have an "unblemished" two year work record. *Id.* at 1249, 1260. Third, to satisfy this element, the court would have to rely almost exclusively on the temporal proximity which is not close at all. Accordingly, the defendant's motion is due to be granted on the retaliation claim.

### b. Legitimate, Nondiscriminatory Reason

The defendant asserts that the plaintiff was laid-off and ultimately terminated because she did not have a valid driver's license which was necessary for her to perform her job. (Doc. 18, p. 29; Doc. 25, p. 9). The undisputed portions of the record demonstrate that having a driver's license was a requirement of the plaintiff's job,[8] her license was suspended on or before November 17, 1999, she was laid-off on that day, and she did not obtain a license at any time before July 14, 2000, when she was terminated.

Because the defendant has articulated a legitimate, non-discriminatory reason for the plaintiff's layoff and termination, the plaintiff must demonstrate that the proffered reason is pretextual. Accordingly, the court, must "determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered "legitimate reasons were not what actually motivated

---

[8] Although the plaintiff stated in her EEOC charge that having a driver's license was not required, the record before this court demonstrates otherwise. (See Church at 35-36; Lewis at 294-95, 339-40, 343, and Lewis, Ex. 9, p. B-5, ¶ 11). This includes Lewis's testimony that it was a requirement.

its conduct." *Combs*, 106 F.3d at 1538.

The court does not find that "the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action[s] that a reasonable fact finder could find them unworthy of credence.'" *Combs*, 106 F.3d at 1538.  As just noted, the plaintiff does not dispute that a driver's license was required to perform her duties, that she did not have a license, and that she did not obtain one prior to her termination.  She has further not shown any employee who was treated differently.  The record clearly demonstrates, and the plaintiff has not effectively challenged, that she was laid-off because she did not maintain her driver's license and she was terminated because she did not obtain a valid driver's license thereafter.

The plaintiff argues that there is evidence of other male employees that did not have driver's licenses that were permitted to continue working for Ervin.  (Doc. 20, p. 4).  At her deposition, the plaintiff stated:

> A:   . . . I knew most people that was [sic] employed that were my co-workers did not have valid driver's licenses as well.
>
> . . . .
>
> Q:   . . . [I]f there were some employees who did not have a valid driver's license, didn't it make it even more important that some of you be able to drive lawfully?
>
> A:   Oh, I totally agree a hundred percent.  Now, who those people are, I do not know.

(Lewis, pp. 350-51).[9]  At no point were these potential comparators identified.  Additionally, there is no indication in the record that they are similar to the plaintiff in that they were employed

---

[9] At the hearing on the motion, the court noted that these pages were not included in the parties submissions.  Counsel thereafter submitted the same and they are in the file on the left side attached to a letter from counsel dated May 23, 2001.

in positions that required that they possess a driver's license. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11ᵗʰ Cir. 1997) (requiring the plaintiff to show that his employer treated similarly situated employees outside his classification more favorably than herself); *Maniccia,* 171 F.3d at 1368 (To establish a prima facie case of disparate treatment, a plaintiff must show, among other things, that her employer treated similarly situated male employees more favorably). The plaintiff's general assertions are unsupported and therefore insufficient to overcome the motion for summary judgment.[10]

### C. Outrage

The plaintiff next advances a claim of outrage against Newton. She states that "Newton outrageously and intentionally inflicted emotional distress upon [her] by subjecting her to insensitive and unprofessional language and touching during [her] employment. . . ." (Doc. 1, ¶ 22). The defendant asserts that the plaintiff has not and cannot state such a claim under the facts. (Doc. 18, p. 31).

The Alabama Supreme Court recently stated as follows:

> The tort of outrage was first recognized by this Court in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981). In that case Inmon, who had formerly been employed as a claims supervisor by American Road Service Company, sued his former employer, alleging that he had been mistreated during the events leading to his termination and that that mistreatment had constituted outrageous conduct; he argued that outrageous conduct should be recognized as a tort. In *Inmon*, this Court recognized such a tort. It discussed the requirements of the tort, emphasizing the extreme nature of the defendant's conduct that would be sufficient to constitute the tort, and the severity of the emotional distress that would entitle a person to recover for that tort:

---

[10] The record evidence demonstrates that ten employees in Ervin's Birmingham district have job duties that include driving company vehicles. (Doc. 20, Ex. 1, p. 4, Response to Interrogatory No. 2). All ten employees have valid driver's licenses. *Id.*

> "The emotional distress [caused by the defendant's conduct]
> must be so severe that no reasonable person could be expected to
> endure it. Any recovery must be reasonable and justified under the
> circumstances, liability ensuing only when the conduct is extreme.
> Comment, Restatement [(Second) of Torts], at 78. By extreme we
> refer to conduct so outrageous in character and so extreme in
> degree as to go beyond all possible bounds of decency, and to be
> regarded as atrocious and utterly intolerable in a civilized society.
> [Cmt. d], Restatement, supra at 72."
>
> The tort of outrage is an extremely limited cause of action. It is so limited
> that this Court has recognized it in regard to only three kinds of conduct:
> (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901
> (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement,
> *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and
> (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322
> (Ala. 1989). *See also* Michael L. Roberts and Gregory S. Cusimano, Alabama
> Tort Law, § 23.0 (2d ed. 1996). In order to recover, a plaintiff must demonstrate
> that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and
> outrageous; and (3) caused emotional distress so severe that no reasonable person
> could be expected to endure it." *Green Tree Acceptance, Inc. v. Standridge*, 565
> So. 2d 38, 44 (Ala. 1990) (citing *American Road Service Co. v. Inmon* ).

*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). The plaintiff states that the entirety of

Newton's conduct constitutes the tort of outrage. Specifically, she states that his conduct in

(1) pulling her toward him and aggressively touching her "backside" with his "groin,"

(2) spreading a rumor through [Ervin] that [she] was pursuing the female secretaries . . . in a

romantic [way]," and (3) telling her he was going to the bathroom and then stating "that he 'was

hoping [she] would hold [his] dick'" constitutes outrage. (Doc. 20, p. 6).

Accepting the plaintiff's allegations, the court finds that they are insufficient to overcome

the motion for summary judgment. The Alabama Supreme Court in recognizing the tort of

outrage stated over twenty years ago that

> we now recognize that one who by extreme and outrageous conduct intentionally
> or recklessly causes severe emotional distress to another is subject to liability for

21

> such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement, *supra*, at 78. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, *supra* at 72. See also Prosser, *Law of Torts* (4th ed.) at 56-60 and Wade, *supra*, for instances which clearly fall within the principle.

*Inmon*, 394 So. 2d at 365. Newton's actions certainly are reprehensible, but they are insufficient to constitute "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id*. The standard is very high to avoid summary judgment on an outrage claim. The plaintiff does not and cannot meet it. The motion is due to be granted.

### D. Assault and Battery

United States Magistrate Judge Susan Walker recently provided an overview of the legal principles applicable to the assault and battery claim. She stated:

> An assault is """"an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'""" *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995) (citations omitted). A successful assault becomes a battery. *Id*. "To succeed on a claim alleging battery, a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex Parte Atmore Community Hospital*, 719 So. 2d 1190, 1193 (Ala. 1998) (citations omitted). Defendant argues that the evidence does not establish that the touching at issue in this case was hostile, angry or rude. The court concludes, however, that the evidence presented by plaintiff with regard to the instances of touching by Russ is sufficient to create an issue of fact regarding whether Russ committed an assault and/or a battery. *See Atmore Community Hospital, supra*, 719 So. 2d at 1194 (finding sufficient evidence of a battery where plaintiff's supervisor "touched her

22

waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg," where there was evidence that the touching was intentional, conducted with sexual overtones, and unwelcome).

*Cartwright v. Tacala, Inc.,* ___ F. Supp. 2d ___, 2000 WL 33287445, at 15 (M.D. Ala. 2000).

As noted by Judge Walker, in *Atmore Community Hospital*, the plaintiff presented evidence that the harasser "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg." *Id.* at 1194. She "also presented evidence indicating that each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." *Id.* "These factual assertions constituted substantial evidence that [the harasser] committed a battery." *Id.* (citing *Surency*, 489 So. 2d at 1104).

Applying *Cartwright* and *Atmore Community Hospital* to the present situation, the court finds that summary judgment is due to be denied on this claim. Newton's conduct in the bucket is sufficient evidence to support a battery claim against him. Viewed in a light most favorable to the plaintiff, there was an intentional touching in an offensive and unwelcome manner. The motion must be therefore be denied on this claim.[11]

### E. Exercise of Supplemental Jurisdiction

In view of the fact that the only remaining claim is assault and battery against Newton, the court must next consider whether it should exercise supplemental jurisdiction over the claim under § 1367(a)[12] or whether it should decline to exercise such jurisdiction under § 1367(c).[13]

---

[11] The court agrees with the parties that the conduct surrounding Newton's actions in the truck before he left to go to the bathroom do not constitute an assault or battery.

[12] The parties do not dispute that the court has the power to hear the supplemental state law claims under 28 U.S.C. § 1367(a), which provides as follows:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have

In *Palmer v. Hosp. Auth. of Randolph Co.*, 22 F.3d 1559, 1569 (11th Cir. 1994), the Court of Appeals reiterated that whenever a federal court has supplemental jurisdiction under section 1367(a) that jurisdiction should be exercised unless section 1367(b) or (c) applies.  When subsection (c) permits a court to decline to exercise its jurisdiction, the court's discretion should be guided by the factors described in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-27 (1966): judicial economy, convenience, fairness to the parties, and comity. 22 F.3d at 1569. Typically, where federal claims are dismissed before trial, these factors will favor dismissal of the state claims. *See e.g., Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *United Mine Workers*, 383 U.S. at 726; *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352-53 (11th Cir. 1997).

In *Gibbs,* "the Supreme Court reiterated that 'when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should

---

supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

[13] Section 1367(c) provides:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

24

decline the exercise of jurisdiction by dismissing the case without prejudice.' *Id*. at 350, 108 S. Ct. at 619 (footnote omitted)." *Eubanks v. Gerwen*, 40 F.3d 1157, 1161-62 (11th Cir. 1994).

Applying the *Gibbs* considerations in the present case, it is apparent that the court should decline to exercise its discretion to hear the remaining claim. Resolution of the plaintiff's state law claim against Newton depends solely on a determination of state law. Accordingly, the state court, and not this court, should be the arbiter of state law. *Baggett v. First National Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997). There no longer is any pressing federal issue in this litigation. The period of limitations for the remaining claim has been tolled and will be tolled so as to permit the plaintiff to refile her claim in state court should she decide to do so. 28 U.S.C. § 1367(d). She will suffer no prejudice. None of the considerations–judicial economy, convenience, fairness to the parties, or comity–warrant continuation of this action in this court. Accordingly, this claim is due to be dismissed without prejudice to the plaintiff's right to refile that claim in state court.

## IV. CONCLUSION

Premised on the foregoing, the defendants' motion for summary judgment is due to be granted in part and denied in part as stated above. Additionally, the remaining assault and battery claim against Newton is due to be dismissed without prejudice to the plaintiff's right to refile the same in state court. The court further finds that the defendants' motion to the extent that it seeks summary judgment on the issue of punitive damages on the assault and battery claim is moot at this point and subject to being renewed should the plaintiff file this action in state court. An order in accordance with the court's findings will be entered contemporaneously herewith.

25

**DONE**, this 21st day of June, 2001.

JOHN E. OTT
United States Magistrate Judge